795 P.2d 502

**C & L LUMBER AND SUPPLY, INC.,**
Plaintiff–Appellee,

v.

**TEXAS AMERICAN BANK/GALERIA,**
Defendant–Appellant,

v.

George J. AUBIN, Wichita Equine, Inc., W.E. New Mexico, Inc., Kenny's Welding, Barney Rue, Frankie Reynolds, Briscoe West and Myrl West, Defendants–Appellees.

No. 18800.

Supreme Court of New Mexico.

June 13, 1990.

The Payne Law Firm, H. Vern Payne, Diane P. Donaghy, Albuquerque, for appellant.

Gary C. Mitchell, Ruidoso, for appellee C & L Lumber.

Karen L. Parsons, Ruidoso, for appellee J.W. Moursund.

Hawthorne & Hawthorne, Richard A. Hawthorne, Ruidoso, for appellees Aubin, Wichita Equine and W.E. New Mexico.

Darrell N. Brantley, Alamogordo, for appellees West.

Ronald G. Harris, Albuquerque, for appellees Kenny's Welding and Barney Rue.

H. John Underwood, Ruidoso, for appellee Frankie Reynolds.

Joe A. McDermott, Houston, Tex., pro se.

## OPINION

RANSOM, Justice.

Texas American Bank appeals from a decision that its mortgages on two tracts of

Ruidoso land are void and that, in a proceeding to foreclose mechanics' and materialmen's liens on the property, the priority of such resulting equitable mortgage liens as were found by the court follows those of the other lien claimants. We affirm.

In August 1980, Joe McDermott, while married to Dixie McDermott, purchased from Briscoe and Myrl West a 1.7 acre tract (small tract) of land adjacent to the racetrack in Ruidoso. McDermott paid $10,000 in cash and entered into a real estate contract with the Wests for the remaining $80,000 of the purchase price. In October 1981, McDermott also purchased from the Wests an adjacent 6.4 acre tract (large tract) for $300,000. McDermott paid the Wests $200,000 in cash from a loan and mortgage with Ruidoso State Bank for that amount, and financed the other $100,000 through a second mortgage to the Wests on both tracts. Dixie McDermott joined in none of these instruments which stated that the property was the sole and separate estate of Joe McDermott, a married man.

In June 1983, McDermott borrowed $200,000 from Texas American Bank and paid off the loan to Ruidoso State Bank. Texas American Bank obtained a mortgage on the large tract and, pursuant to a subordination agreement with the Wests, was placed in first position over the Wests' mortgage of October 1981. McDermott also borrowed $120,000 from Texas American Bank in July 1983 and used $60,000 of the loan to pay off the real estate contract on the small tract.[1] Pursuant to this loan, the Bank obtained a mortgage on the small tract, and because of a subordination agreement with the Wests, acquired first position over the Wests' mortgage of September 1981.

In August 1984, McDermott and his wife were divorced. At that time she conveyed to him her community interest in the two tracts by special warranty deed recorded in November 1984.

The promissory notes on the large and small tracts given by McDermott to Texas American Bank were due and payable in six months from the time of execution. However, the Bank and McDermott entered into various extension agreements between September 1984 and March 1985. Eventually, construction of horse barns was begun on the two tracts on April 7, 1986, and was substantially completed in July 1986.

C & L Lumber, the materials supplier for the construction project, brought suit in December 1986 to foreclose its materialmen's lien on the property. In the foreclosure action, the court determined the lien priorities of the following parties: Texas American Bank, the Wests, and mechanics' and materialmen's lien claimants C & L Lumber, Barney Rue, Frankie Reynolds, and Kenny's Welding.

The court held that Texas American Bank was not entitled to first priority as to either of the tracts because the mortgages granted by McDermott were void, not having been signed also by his wife. Except in the case of purchase-money mortgages, spouses must join in all mortgages of community real property. NMSA 1978 § 40–3–13(A) (Repl.Pamp.1989). Any attempt to mortgage community real property made by either spouse alone is void. *Id.*

Regarding the small tract, the court determined the lien priorities to be: (1) C & L Lumber, (2) Frankie Reynolds, (3) Kenny's Welding, (4) Barney Rue, and (5) Texas American Bank. Regarding the large tract, the lien priorities were determined to be: (1) the Wests, (2) Barney Rue, and (3) Texas American Bank.

Texas American Bank renews various arguments on appeal: that the Bank's refinancing of the West real estate contract and the Ruidoso State Bank mortgage created purchase-money mortgages which come within the exception set forth in Section 40–3–13(A); that the Bank was subrogated to the purchase-money mortgage po-

---

1. There is no evidence in the record that the loan proceeds from the refinancing transaction on the large tract were used in their entirety to pay off the purchase-money mortgage with Rui-

doso State Bank. We do not decide whether the result of our opinion would have been the same if such facts had been established.

sition held by the Wests and Ruidoso State Bank; that by virtue of the various extensions of the Bank's notes and liens, which were recorded before the mechanics' and materialmen's liens were perfected, the Bank has liens against both tracts superior to the mechanics' and materialmen's liens; that the Wests are estopped to deny the validity or priority of the Bank's mortgages on the large tract by virtue of the mortgage subordination agreement; that any defect in the Bank's mortgages was cured by "after-acquired title." Additionally, the Bank now claims that the court erred in applying the joinder requirement of Section 40–3–13(A) inasmuch as the two tracts were not community property. The Bank also asserts that it is error to apply the joinder requirement in favor of parties other than a nonsigning spouse.

*Community property issues.* We first address arguments that the Bank raises concerning the characterization of the two tracts as community property and the intended application of the joinder statute. The Bank asserts that the appellees failed to meet their burden of proving that the two tracts were community property. The Bank points to the documents executed by McDermott as "a married man dealing with his sole and separate property," and states that under *Sanchez v. Sanchez,* 106 N.M. 648, 748 P.2d 21 (Ct.App.), *cert. denied,* 106 N.M. 627, 747 P.2d 922 (1987), this raises a presumption that the property was McDermott's separate property. The Bank's argument misconstrues New Mexico community property law.

 Under Section 40–3–12(A), property acquired during marriage by either spouse is presumed to be community property. The recitation in a deed not signed by both spouses that the property is the "sole and separate property" of a married man does not affect this presumption. The party seeking to rebut the presumption has the burden of introducing factual evidence that the disputed property meets a criterion of separate property as defined in Section 40–3–8. *Arch, Ltd. v. Yu,* 108 N.M. 67, 766 P.2d 911 (1989). Texas American Bank failed to produce at trial any evidence that

would support a characterization of the two tracts as separate property under Section 40–3–8; nor was it suggested that the tracts were purchased with McDermott's separate funds.

Additionally, the Bank is mistaken in its claim that it is entitled to the benefit of a presumption of separate property under *Sanchez.* In that case, the court applied a statutory presumption applicable to property acquired by a *married woman* in her name alone. *Sanchez,* 106 N.M. at 650, 748 P.2d at 23. Even so, the Community Property Act of 1973 repealed this presumption for transactions occurring after passage of the Act. *See* 1973 N.M.Laws, ch. 320, § 14; NMSA 1978, § 40–3–12.

 Finally, we note that Texas American Bank never requested a finding or conclusion that the property was McDermott's *separate* property. A party who has failed to request a finding of ultimate fact has waived such a finding, SCRA 1986, 1–052(B)(1)(f), and has not preserved the question for appeal. *Davis v. Davis,* 77 N.M. 135, 419 P.2d 974 (1966). Having failed to preserve for appeal a question of McDermott's separate property, Texas American Bank cannot contest the court's finding treating the property as a community asset, nor can the Bank obtain a review of the evidence supporting this characterization of the asset. *See Wagner Land & Inv. Co. v. Halderman,* 83 N.M. 628, 495 P.2d 1075 (1972).

 The Bank's final argument on this point is that Section 40–3–13 was intended to protect the interests of a nonjoining spouse, and the court erred in allowing lien claimants to raise the joinder issue. A review of our cases involving the joinder statute shows, however, that the issue has been raised by a variety of parties in addition to the nonjoining spouse. *See, e.g., Arch, Ltd. v. Yu,* 108 N.M. 67, 766 P.2d 911 (1989) (issue raised by husband, who alone executed real estate exchange agreement, as a defense to breach of contract action); *Hannah v. Tennant,* 92 N.M. 444, 589 P.2d 1035 (1979) (issue raised by vendees to avoid contract not joined by vendor's wife). *See also McGrail v.*

*Fields,* 53 N.M. 158, 203 P.2d 1000 (1949) (spouses not parties to quiet title suit; decided under former law). The joinder statute is directed at the conveyance itself not at the identity of the person claiming the conveyance is void. We believe it contains no limitations regarding for whose benefit it may be used.

*Purchase-money mortgage exception to Section 40–3–13(A).* Assuming that the two tracts were community property, the Bank states that the refinancing agreements on both tracts should be treated as purchase-money mortgages, an express exception to the joinder requirement of Section 40–3–13(A) for mortgages affecting community property. The Bank reasons that either each transaction itself created a valid purchase-money mortgage, or the refinancing transactions subrogated the Bank to the purchase-money mortgage position held by Ruidoso State Bank on the large tract, and the Wests on the small one.

■ A purchase-money mortgage is a mortgage executed at the same time as the deed of the purchase of land, or in pursuance of agreement as part of one continuous transaction, in favor of the vendor, or a third-party lender of the purchase price paid to the vendor, provided the money was loaned for this purpose. *See Davidson v. Click,* 31 N.M. 543, 249 P. 100 (1926); 4 *American Law of Property,* § 16.106E (1952).

■ Initially, we note that the Bank is correct (despite the trial court finding to the contrary) in stating that the original financing by the Ruidoso State Bank on the large tract created a purchase-money mortgage in favor of the Ruidoso Bank. McDermott granted the mortgage as part of the same transaction in which the vendor executed the deed of purchase transferring title to the property. However, we cannot agree that the refinancing of that obligation creates a second purchase-money mortgage. Title had already passed to McDermott as part of the original financing transaction. McDermott was already indebted for the purchase price. The subsequent borrowing was for the purpose of discharging this debt, not for the acquisition of title.

■ With reference to the small tract, the Bank also argues that its loan to McDermott allowing him to pay off the real estate contract with the Wests on the small tract created a purchase-money mortgage. Here, the Bank correctly points out that McDermott first acquired legal title to the small tract when the sales contract was paid off. The Bank relies on the treatment of almost the same question in *Liberty Parts Warehouse, Inc. v. Marshall County Bank & Trust,* 459 N.E.2d 738, 739 (Ind.App.1984).

In *Liberty Parts,* the purchaser under a land contract executed a mortgage to secure a loan and used the proceeds to pay off the land contract. The mortgage was deemed to be a purchase-money mortgage having priority over a prior judgment lien against the contract purchaser's interest in the real estate. The court stated that because the proceeds of the bank loan were used to acquire legal title to the real estate, and the deed and mortgage were executed as part of the same transaction, the judgment lien was junior to the purchase-money mortgage of the bank.

We first point out that the loan from Texas American Bank for $120,000 was far in excess of that needed to pay off the real estate contract. That in itself should suggest problems with treating the mortgage to secure it as a purchase-money mortgage superior to all other liens affecting the property. Notwithstanding this fact, we still cannot agree with the Bank's argument or the conclusions of the *Liberty* court.

■ In addition to "superior equities," the basis usually given for the priority of a purchase-money mortgage, as recognized by *Liberty Parts,* is that "there is no moment at which the judgment lien can attach to the property before the mortgage of one who advances purchase money." *Id.* at 739. In New Mexico, the purchaser's equitable estate under a land sales contract is an estate in property. *Hobbs Mun. School Dist. No. 16 v. Knowles Dev. Co.,* 94 N.M. 3, 606 P.2d 541 (1980). He is

treated as the owner and his interest in the property is subject to a judgment lien. *Mut. Bldg. & Loan Assoc. of Las Cruces v. Collins*, 85 N.M. 706, 516 P.2d 677 (1973), *overruled on other grounds, Marks v. City of Tucumcari*, 93 N.M. 4, 595 P.2d 1199 (1979). Thus, various liens in fact may attach themselves to property under a land sales contract prior to the execution of a refinancing loan and mortgage. To hold that such a refinancing mortgage was a purchase-money mortgage, entitled to priority over all other liens, would ignore both the earlier attachment of these liens and the possible inequity in subordinating them to the refinancing agreement. We conclude that under New Mexico law a mortgage executed for the purpose of paying off a land sales contract is itself not a purchase-money mortgage.

■ *Subrogation.* As stated previously, Texas American Bank argues that it has a purchase-money mortgage on both tracts because it was subrogated to the purchase-money mortgage position of the original vendors by virtue of the refinancing transactions. While we do not agree that the real estate contract on the small tract is itself a purchase-money mortgage, for the purposes of this argument we will treat it as such. Having examined the cases relied upon by the Bank, we find that they do not stand for the proposition that a lender who refinances a purchase-money mortgage is entitled, from that circumstance alone, to be subrogated to the rights of the holder of the first mortgage.

In *Simson v. Bilderbeck, Inc.*, 76 N.M. 667, 417 P.2d 803 (1966), Bilderbeck obtained a loan, which Simson signed, securing it with a mortgage on the real property involved. Bilderbeck was experiencing financial difficulties, and before this note became due, the bank asked Simson to pay the note. Simson did so and received from the bank an assignment of the note and mortgage. Simson did not execute a new note and mortgage.

The court ruled that, under NMSA 1953, Repl. Vol. 8 Part 1 (1962), Section 50A–3–415(1), Simson was an accommodation party, and under NMSA 1953, Section 50A–3–

415(5), he had a right of recourse on the note against Bilderbeck. *Simson*, 76 N.M. at 669, 417 P.2d at 804. Simson acquired the rights of a transferee by paying the note, under NMSA 1953, Section 50A–3–603(2), and pursuant to Section 50A–3–201(1), acquired the rights of the transferor bank. *Id.* The court held that, "By the terms of our statutes, the note was not discharged when paid by [Simson], the accommodation maker." *Id.*

The subrogation in *Simson* was based on Simson's status as an accommodation party, and his statutory rights as a transferee after assignment of the mortgage. Texas American Bank is not claiming that it had the status of a transferee. The Bank and McDermott executed a new note and mortgage; there was no assignment of the Ruidoso note and mortgage.

The other New Mexico cases cited by Texas American Bank, *State Farm Mutual Automobile Insurance Co. v. Foundation Reserve Insurance Co.*, 78 N.M. 359, 431 P.2d 737 (1967), and *Fireman's Fund American Insurance Companies v. Phillips, Carter, Reister & Associates, Inc.*, 89 N.M. 7, 546 P.2d 72 (Ct.App.), *cert. denied*, 89 N.M. 5, 546 P.2d 70 (1976), are also unpersuasive on the subrogation issue. These cases actually weaken the Bank's argument. Both of these cases indicate that subrogation is generally not allowed when a third party, in the absence of some compulsion or duty, pays the debt of another. *See State Farm*, 78 N.M. at 363, 431 P.2d at 741; *Fireman's*, 89 N.M. at 9, 546 P.2d at 74.

Texas American Bank has not suggested that it had some legal duty to pay off the initial obligations in question, or that it did so to protect its interests. And, as we have discussed, the Bank received no assignment of the rights under those instruments from either the Ruidoso State Bank or the Wests. In the absence of any of these factors the subrogation argument must fail.

■ *Loan Extensions.* Texas American Bank argues that the extensions on the real estate note and mortgage given to McDermott by the Bank constitute effec-

tive, or new, mortgages on both tracts. These extensions were executed after Dixie McDermott transferred her interest in the property to her husband, and were recorded prior to the time any mechanics' or materialmen's liens were perfected. Once divorced from Dixie McDermott there is no reason why McDermott could not have executed a valid new mortgage on the property.

There are no New Mexico statutes defining the factors essential to create a mortgage. The legislature has approved the use of a concise statutory mortgage form in Section 47-1-44; however, this form does not preclude the use of others. *See* § 47-1-27.

Looking at the September 1984 extension agreements, the import of these extensions is that McDermott wishes to extend the note and carry forward the lien securing the note, and Texas American Bank agrees to do so. The extension agreement states in its final paragraph that the:

> extension or rearrangement shall in no manner affect or impair said note or the lien * * * securing the same and that said lien * * * shall not in any manner be waived, the purpose of this instrument being simply to extend or rearrange the time or manner of payment of said note * * * and to carry forward all liens securing the same, which are acknowledged by the Undersigned to be valid and subsisting, and the Undersigned further agrees that all terms and provisions of said original note and of the instrument or instruments creating or fixing the lien or liens securing the same shall be and remain in full force and effect as therein written, except as otherwise expressly provided herein.

The tenor of the instrument indicates that the parties intended to extend the note and "carry forward" the lien. The last paragraph specifically requires that the original lien remains in effect. This instrument does not manifest an intent by the parties to create a *new* lien. The extension agreements do not grant to Texas American Bank a new mortgage on the properties. The agreements merely extend the two original mortgages, void under Section 40-3-13(A).

█ *Estoppel.* Texas American Bank makes its estoppel argument only with respect to the large tract. It argues that the Wests are estopped from asserting a lien position superior to Texas American Bank because of the mortgage subordination agreement between them. We first point out that the only finding or conclusion Texas American Bank requested on estoppel was its requested Conclusion of Law No. 3, which was refused:

> Briscoe West and Myrl West ("West") are estopped to deny the validity or priority of Bank's mortgages by virtue of their execution of the Mortgage Subordination Agreements submitted as Bank Exhibits 7 and 9, and referred to in Findings numbered 6 and 8 above, and their acceptance of benefits of the proceeds of Bank's loan.

Although submitted as a requested conclusion of law, the request can be understood to be one for a mixed finding of fact and conclusion of law. Other than this request, Texas American Bank requested no findings on the factual elements of estoppel, specifically the element of reliance. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982) (elements of equitable estoppel). Nonetheless, for the purpose of making a worthwhile point on the merits of the argument, we will treat the estoppel issue as having been raised adequately and preserved for appeal. We infer from the requested conclusion of law that the basis for the estoppel claim is that, by virtue of the subordination agreement and acceptance of benefits, Texas American Bank "relied to its detriment."

█ This Court has recognized that the party seeking to establish the claim of estoppel must, under all of the circumstances of the case, have the right to rely upon any representations that were made. *La Luz Community Ditch Co. v. Town of Alamogordo*, 34 N.M. 127, 279 P. 72 (1929); *Trujillo v. Gonzales*, 106 N.M. 620, 747 P.2d 915 (1987). Stated differently, the reliance of the party seeking to assert the

doctrine must have been reasonable. *Taxation & Revenue Dep't v. Bien Mur Indian Market,* 108 N.M. 228, 770 P.2d 873 (1989). We cannot say that the Bank had a right to rely on the subordination agreement under the facts of this case. The Bank is charged with knowledge of the law, in this instance the New Mexico community property laws and the joinder statute. *Frkovich v. Petranovich,* 48 N.M. 382, 394, 151 P.2d 337, 345 (1944). The Bank apparently was aware that the property was acquired by McDermott when he was a married man. The Bank does not suggest that the Wests concealed this fact from them or that they were misled as to its significance. For these reasons, any reliance upon the subordination agreement was unfounded, and the Wests are not estopped to deny the validity or priority of the Bank's mortgage.

■ *After-acquired title.* Finally Texas American Bank asserts that McDermott's after-acquired title, resulting from the special warrant deeds executed by Dixie McDermott, cured the defects in the original mortgages. The answer to this argument is that although other jurisdictions have applied the doctrine of after-acquired title to cure defects in mortgages, the application of the doctrine to documents void at the time of execution for failure to join both spouses has been rejected in New Mexico. *McGrail v. Fields,* 53 N.M. 158, 203 P.2d 1000 (1949); *Jenkins v. Huntsinger,* 46 N.M. 168, 125 P.2d 327 (1942).

For all of the reasons discussed above, we affirm the decision of the district court.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.